UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRIPLE INVESTMENT GROUP, LLC,

      Plaintiff,

v.

                                                Case No. 13-cv-13382
                                                Honorable Gershwin A. Drain

THE HARTFORD STEAM BOILER
INSPECTION AND INSURANCE
COMPANY,

      Defendant.
      _____/

### OPINION AND ORDER GRANTING DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT [#47, 48]

#### I. INTRODUCTION

On August 6, 2013, Plaintiff, Triple Investment Group, LLC ("Triple Investment"), commenced this action against Defendant, The Hartford Steam Boiler Inspection and Insurance Company ("Hartford Steam Boiler"). In the Complaint, Plaintiff alleges that there was a mechanical breakdown of a furnace covered by an insurance policy issued by Defendant. Plaintiff further alleges that the mechanical breakdown caused the destruction of the Pontiac Silverdome's roof. As a result, Plaintiff contends that Defendant breached the insurance contract between the Parties, and now seeks over $22 million in damages due to the alleged mechanical breakdown of the furnace.

Presently before the Court is the Defendant's Motion for Summary Judgment. *See* Dkt. Nos. 47, 48. This matter is fully briefed, and a hearing was held on December 3, 2014. For the reasons discussed herein, the Court will **GRANT** Defendant's Motion for Summary Judgment.

-1-

## II. FACTUAL BACKGROUND

The Pontiac Silverdome ("Silverdome") is an 80,000-seat stadium located at 1200 Featherstone Road, Pontiac, Michigan. The Silverdome was built in 1975, with an original roof that consisted of Teflon-coated fiberglass panels. The roof panels were air-supported and cable restrained. The air used to inflate and support the original roof was supplied by makeup air units situated at the top of the Silverdome. These air units were fixed along the perimeter of the roof and forced air into the stadium, keeping the original roof inflated.

On March 4, 1985, the original Silverdome roof collapsed due to accumulation of snow on the roof and strong winds. A company named Birdair manufactured a replacement roof for the Silverdome that consisted of 100 single-layer, Teflon-coated fiberglass panels. These panels had a lower profile making the replacement roof more resistant to snow and wind.

Additionally, the 1985 roof replacement incorporated a number of equipment upgrades, including the addition of 10 new rooftop makeup air units. These 10 new units were equipped with furnaces capable of operating in a "high-fire" setting; the high-fire setting helped melt snow on the roof. The 10 new rooftop units were installed as additions to four preexisting, auxiliary indirect furnaces that were part of the original construction of the stadium. The four preexisting furnaces were mounted in the north, south, east, and west quadrants of the Silverdome. Also, in addition to the ten new rooftop units, the Silverdome was equipped with 11 concourse heaters in order to heat the stadium for events. Thus, in total, the Silverdome was equipped with 25 furnaces for heating the Silverdome and its roof.

Even with the additional furnaces, however, the Silverdome roof, suffered another tear in January of 1999. Birdair completed temporary repairs for this tear in January of 1999 and made permanent repairs in July of 1999. From 1992 to 2009, an individual named John Kissick was in

charge of operating and maintaining the Silverdome roof and related equipment and systems. This responsibility later fell to Alan Allard ("Allard"), an appointee of Plaintiff, following Plaintiff's purchase of the Silverdome at auction from the City of Pontiac for approximately $500,000, in December of 2009.

Upon purchasing the Silverdome, Plaintiff purchased an insurance policy (the "Policy")—Number FBP2337892—from the Defendant with effective dates of December 1, 2012 through December 1, 2013. Subject to all of its terms, conditions, definitions, and exclusions, the Policy provides "equipment Breakdown Coverage" for "covered equipment" located at the Silverdome.

On December 24, 2012, a winter storm was expected to hit the Pontiac area. At the time, the west indirect furnace had ceased operating and was not serviced or returned to operation. Furthermore, of the 10 rooftop air units with furnaces and snow-melt capacity, only seven of the rooftop air units were operable on December 24, 2012. With only seven of the 10 rooftop furnaces functioning, Allard attempted to start the three functioning main furnaces in order to generate more heat for the roof due to the impending storm. Although the furnaces for the east and south sections of the roof started normally, the furnace for the north section of the roof (the "North Furnace") would not start.

In the days following the alleged failure of the North Furnace, snow and ice began to accumulate on the roof of the Silverdome. At approximately 1:30 a.m., on December 29, 2012, a large piece of ice slid down the Silverdome roof, tearing an approximate 5x20-foot hole at the bottom of one of the rectangular roof panels in the north section of the roof. In response, on that same day, Mr. Allard called the Metrodome in Minnesota, the Superdome in New Orleans, and four different roof contractors to figure out how to repair the hole. Also, on December 29, 2012,

Alex Loewy ("Loewy"), the Silverdome's events coordinator, placed calls to Birdair to attempt to get someone to repair the hole.

On December 30, 2012, Loewy twice spoke with David Ricci of Birdair and was told Birdair would send someone to repair the Silverdome the morning of December 31, 2012. On December 31, 2012, Greg Francuch ("Francuch") of Birdair implemented a temporary "stop-patch" repair. By the time Mr. Francuch implemented the stop-patch repair, Plaintiff contends that the hole had doubled in size to 10x40-feet.

Following the stop-patch repair, the Parties agree the next step would have been to perform a temporary "grid-patch" repair using mesh to cover the hole. The grid-patch repair was the repair that was used to repair the hole that formed in the roof in 1999. However, the temporary grid-patch repair never occurred.

Plaintiff asserts that, on January 1, 2013, the stop-patch repair failed, and the roof suffered even further tearing. After internal discussions, Plaintiff decided to deflate the roof on January 2, 2013. Following the roof's deflation, Plaintiff claims gale force winds ravaged the deflated roof. By January 20, 2013, the roof was severely damaged and destroyed; however, Plaintiff had yet to provide any notice to Defendant regarding the alleged mechanical breakdown.

On January 25, 2013, Plaintiff submitted its first claim notice to Defendant regarding the furnace's alleged mechanical breakdown. Defendant received Plaintiff's claim and conducted four inspections at the Silverdome using Defendant's HVAC contractors, mechanical and structural consultants, and engineers. Defendant's four inspections took place on February 5, 2013, February 28, 2013, March 21, 2013, and March 27, 2013. Additionally, Defendant asserts that it communicated with Birdair as a part of its investigation.

According to Plaintiff, it took Defendant's HVAC contractor 27 days—from February 28, 2013 to March 27, 2013—to analyze and fix the problem with the North Furnace. On July 19, 2013, upon the conclusion of its investigation, Defendant denied Plaintiff's insurance claim, explaining that there was no coverage under the Policy for Plaintiff's claim. Plaintiff later commenced this action on August 6, 2013. Plaintiff contends that the disputed insurance proceeds exceed $20 million.

## III. LAW & ANALYSIS

### A. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure empowers the Court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the Court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, and all reasonable inferences, must be construed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(a) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

**B.     Legal Analysis**

Michigan law governs this insurance dispute. Under Michigan law, the rules for construction of an insurance contract are the same as for any other written contract. *See Comerica Bank v. Lexington Ins. Co.,* 3 F.3d 939, 942 (6th Cir. 1993) (citing *Hall v. Equitable Life Assurance Society,* 295 Mich. 404, 295 N.W. 204 (Mich. 1940)). "'[C]onstruction and interpretation of an insurance contract is a question of law . . .'" *Doeren Mayhew & Co., P.C. v. CPA Mut. Ins. Co. of Am. Risk Retention Grp.*, 633 F. Supp.2d 434, 440 (E.D. Mich. 2007) (quoting *Henderson v. State Farm Fire and Casualty Co.,* 460 Mich. 348, 353, 596 N.W.2d 190 (1999)) (brackets in original).

Insurance policies should be construed according to the well-settled principles of contract construction. *See ABO Petroleum, Inc. v. Colony Ins. Co.*, No. 04-cv-72090, 2005 WL 1050220,

at *7 (E.D. Mich. Apr. 19, 2005) (citing *McKusick v. Travelers Indem. Co.,* 246 Mich. App. 329, 632 N.W.2d 525, 528 (2001)). "'An insurance policy must be read as a whole in order to discern and effectuate the intent of the parties.'" *Id.* (quoting *Farmers Ins. Exch. v. Kurzmann,* 688 N.W.2d 199, 203 (2003)). Language in an insurance contract "is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended." *Comerica Bank*, 3 F.3d at 942.

When interpreting insurance contracts, the Court must first determine if the policy language is ambiguous. *Harvey Oil Co. v. Federate Mutual Ins. Co.,* 61 F.3d 903, 1995 WL 431010, at *2 (6th Cir. July 20, 1995) (citing *Ray Indus. v. Liberty Mut. Ins. Co.,* 974 F.2d 754, 759 (6th Cir. 1992)). "'When the language in an insurance contract is subject to more than one reasonable interpretation, it is considered ambiguous.'" *ABO Petroleum, Inc.*, 2005 WL 1050220 at *8 (quoting *Farmers Ins. Exch. v. Kurzmann,* 257 Mich. App 412, 418, 688 N.W.2d 199, 204 (2003); *see also Farm Bureau Mut. Ins. Co. v. Blood,* 230 Mich. App. 58, 61-62, 583 N.W. 2d 476, 478 (1998) (holding that an insurance contract is ambiguous if its language can reasonably be understood in differing ways). Ambiguities in an insurance contract are to be construed in favor of the insured. *See Doeren Mayhew & Co., P.C.*, 633 F. Supp.2d at 440 (citing *Henderson*, 460 Mich. at 354, 596 N.W. 2d at 194).

While the court should construe ambiguities in favor of the insured, the Michigan Supreme Court has instructed that "'this does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefitting an insured.'" *Liberty Mut. Fire Ins. Co. v. Holka*, 984 F. Supp.2d 688, 695 (E.D. Mich. 2013) (quoting *Henderson,* 460 Mich. at 354, 596 N.W.2d at 194). The Court will not "create an

ambiguity where the terms of the contract are clear." *Doeren Mayhew & Co., P.C.*, 633 F. Supp. 2d at 440 (citing *Frankenmuth Mutual Ins. Co. v. Masters*, 460 Mich. 105, 111, 595 N.W.2d 832, 837 (1999)). For example, "'[t]he fact that a policy does not define a relevant term does not render the policy ambiguous. Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings.'" *Liberty Mut. Fire Ins. Co.*, 984 F. Supp. 2d at 695 (quoting *Henderson*, 460 Mich. at 354, 596 N.W.2d at 194); *see also Group Ins. Co. of Michigan v. Czopek,* 440 Mich. 590, 596, 489 N.W.2d 444, 447 (1992).

If the language of the insurance contract is unambiguous, the court must enforce the terms as written. *Ray Indus. v. Liberty Mut. Ins. Co.,* 974 F.2d 754, 759 (6th Cir. 1992). When the contract is unambiguous, the meaning and intent of the contract language shall be given full effect. *ABO Petroleum, Inc.*, 2005 WL 1050220, at *8 (citing *St. Paul Fire & Marine Ins. Co. v. American Home,* 444 Mich. 560, 514 N.W.2d 113 (1994)); *see also Group Ins. Co. of Michigan,* 440 Mich. at 596-97, 489 N.W.2d at 447 ("We cannot create ambiguity where none exists. It is also improper for us to rephrase or interpret the clear and unambiguous language of the policy. Instead, we must enforce the language of the contract as it is written.") (citations omitted).
"It is well-established that an insured has the initial burden of proving that its losses fall within the scope of the policy's insuring agreement." *Detroit Water Team Joint Venture v. Agricultural Ins. Co.,* 371 F.3d 336, 339 (6th Cir. 2004) (citing *Esicorp, Inc. v. Liberty Mut. Ins. Co.,* 266 F.3d 859, 864 (8th Cir. 2001), and applying Michigan law). Defendant contends that, given the evidence, Plaintiff has not met this burden.

First, Defendant contends that it is entitled to summary judgment because Plaintiff failed to give prompt notice and to mitigate damages regarding the destruction of the roof, as required by the Policy. *See* Dkt. No. 48 at i. Second, Defendant argues that the roof's destruction was not

a fortuitous event as defined by the Policy. *Id.* Even if it was a fortuitous event, Defendant maintains in the alternative that the roof's destruction was not a covered event under the policy because it was not the "direct result of" or "solely attributable to" the alleged breakdown of the North Furnace. *Id.* After conducting a thorough analysis of the evidence and Motions, the Court agrees that Defendant is entitled to judgment in its favor.

### 1. Plaintiff Did Not Provide Defendant with Prompt Notice of the Purported Mechanical Breakdown of the North Furnace.

The Policy at issue indicates that the insured was required to perform certain "Duties in the Event of Loss or Damage." Dkt. No. 50 at 33 (Ex. A. p. HSB000034). In the event of loss or damage, the Policy indicated that that Plaintiff must "[g]ive [Defendant] *prompt notice* of the loss or damage, including a description of the property involved." *Id.* (emphasis added).

The Court notes that "'[a]n insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy.'" *ABO Petroleum, Inc.*, 2005 WL 1050220, at *7 (quoting *Heniser v. Frankenmuth Mut. Ins. Co.,* 449 Mich. 155, 161, 534 N.W.2d 502, 505 (1995)). Insurance policies like the one at issue, which requires prompt notice, do not contravene public policy. *See*, *e.g.*, *Wendel v. Swanberg*, 384 Mich. 468, 477, 185 N.W.2d 348, 352 (1971) ("Provisions in liability insurance contracts requiring the insured to give the insurer immediate or prompt notice of accident or suit are common, if not universal.").

Furthermore, although the term "prompt" is not defined under the Policy, the Court finds that there is one readily reasonable interpretation of the term. As previously discussed, a Policy's failure to define a relevant term does not render the policy ambiguous. *See Liberty Mut. Fire Ins. Co.*, 984 F. Supp.2d at 695 (quoting *Henderson,* 460 Mich. at 354, 596 N.W.2d at 194). Instead, the Court must interpret the terms of the contract in accordance with its commonly used

meaning. *See id.*; *see also Henderson*, 460 Mich. at 354, 596 N.W.2d at 194; *Group Ins. Co. of Michigan,* 440 Mich. at 596, 489 N.W.2d at 447.

Prompt notice has "generally been construed to mean within a reasonable time under the circumstances of the case." 13 Couch on Ins. § 190:31 (2014); *see also* Dkt. No. 53 at 17-18 (citing *Burgess v. American Fidelity Fire Ins. Co.,* 107 Mich. App. 625, 628, 310 N.W.2d 23, 25 (1981), and *Kennedy v. Dashner,* 319 Mich. 491, 493-94, 30 N.W.2d 46, 47 (1947), to note that "Michigan law construes policy language requiring the insured to give notice 'immediately' or 'as soon as practicable' as requiring notice 'within a reasonable time.'").

The Sixth Circuit has found that, "[u]nder Michigan law, late notice to an insurance company will not eliminate an insurer's obligations under a policy unless the insurer can demonstrate that it has been prejudiced by the delay." *West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1036 (6th Cir. 1990) (citing Michigan cases). Michigan courts have required insurers to demonstrate prejudice due to the purpose of insurance notice provisions. *See id.* at 1036 n.8. According to the Michigan Supreme Court, the purpose of notice provisions is "to give the insurer an opportunity to investigate the facts and circumstances affecting the question of liability and the extent of such liability." *Wehner v. Foster,* 331 Mich. 113, 119, 49 N.W.2d 87, 90 (1951); *see also Wendel,* 384 Mich. at 477, 185 N.W.2d at 352 (stating that notice provisions "allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims.").

Since the purpose of insurance notice provisions are to provide an insurer an opportunity to investigate and evaluate claims to defend against unsound ones, it follows that prejudice will be found if the insurer demonstrates that a delay in providing notice materially impaired the insurer's ability to contest its liability to an insured. *See*, *e.g.*, *West Bay Exploration Co.*, 915

F.2d at 1036-37 (citing *Wendel,* 384 Mich. at 479, 185 N.W.2d at 354; *Burgess,* 107 Mich. App. at 628, 310 N.W.2d at 25; and *Anderson v. Kemper Ins. Co.,* 128 Mich. App. 249, 254, 340 N.W.2d 87, 90 (1983), for the proposition that defendants must show "they have been materially injured in their ability to contest the merits of the case. . . .").

To reiterate, the burden of demonstrating prejudice rests upon the insurer. *See id.* at 1036 (citing, amongst previously mentioned cases, *Steelcase, Inc. v. Am. Motorists Ins. Co.*, No. 89-1344, 1990 WL 92636, at *2 (6th Cir. Jul. 3, 1990)[907 F.2d 151 (Table)] (unpublished per curiam)). Nevertheless, Michigan law does *not* require an insurer to prove that but for the delay it would have avoided liability. *Id.* at 1037 (citing *Steelcase,* 1990 WL 92636, at *4); *see also Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F. Supp. 2d 800, 813 (E.D. Mich. 1998).

"An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded." *Aetna Cas. & Sur. Co.*, 10 F. Supp.2d at 813. Instead, an insurer "must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate." *Id.* at 813-14 (citing *Dashner,* 319 Mich. at 494, 30 N.W.2d at 47; *Christopher v. Hartford Ins. Grp.*, No. 89-cv-72492, 1992 WL 873328, at *2-3 (E.D. Mich. July 1, 1992)).

The question of prejudice is generally to be left to the trier of fact. *West Bay,* 915 F.2d at 1037 (citing *Wendel,* 384 Mich. at 478 n. 8, 185 N.W.2d 353 n. 8). However, where the facts are so clear that "one conclusion only is reasonably possible," the question is one of law. *See*, *e.g.*, *West Bay,* 915 F.2d at 1037; *ABO Petroleum, Inc.*, 2005 WL 1050220 at *13; *Aetna Cas. & Sur. Co.*, 10 F. Supp. 2d at 813; *Wehner,* 331 Mich. at 120-22, 49 N.W.2d at 90-91 (trial court erred

-11-

in submitting the question to the jury); *CPC Int'l, Inc. v. Aerojet-Gen. Corp.*, 825 F.Supp. 795, 813 (W.D. Mich. 1993).

In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, courts consider whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured. *See Aetna Cas. & Sur. Co.*, 10 F. Supp. 2d at 813.

Here, the Parties dispute whether Plaintiff provided prompt notice, which is a condition precedent to Plaintiff's recovery under the Policy. Additionally, the Parties dispute whether Defendant has demonstrated that it was materially prejudiced by the notice provided by Plaintiff. Plaintiff argues that Defendant's arguments are "specious at best, and fact questions at worst." The Court disagrees.

Plaintiff does not dispute that it waited 30 days before providing notice to Defendant. Instead, Plaintiff argues that Defendant "does not cite to any case indicating thirty-day notice is, by definition untimely." Dkt. No. 53 at 23. In response, Defendant correctly points out that it did, in fact, cite "[*ABO Petroleum, Inc.*,] and note[] that Judge Cleland, applying Michigan law, found no question of fact that a thirty-day delay in providing notice was late." Dkt. No. 62 at 6 (citing Dkt. No. 48 at 22); *see also ABO Petroleum. Inc.*, 2005 WL 1050220, at *15 (finding under the circumstances of that case that "no reasonable jury could conclude that Plaintiff notified Defendant 'as soon as practicable'" because the Plaintiff in that case "waited nearly a month before making a claim with Defendant.").[1]

---

[1] Furthermore, the Court notes that several cases cited by the Defendant supports its position. *See*, *e.g.*, *Cont'l Studios v. Am. Auto. Ins. Co.*, 340 Mich. 6, 11, 64 N.W.2d 615, 618 (1954) (ruling that 34 days' notice was too long

Additionally, Plaintiff argues that Defendant is not entitled to summary judgment because "there is no evidence to suggest the roof could have been reinflated and repaired." Dkt. No. 53 at 24. Plaintiff's argument that there is no evidence suggesting the roof could have been repaired is not compelling; particularly in the context of explaining that Defendant was not prejudiced. Occasionally, catastrophic and unexpected accidents may occur that immediately destroy an insured's property. In such situations there will understandably be little evidence for insurers to conduct an investigation. This is not one of those situations.

Here, from the outset, Plaintiff's Complaint makes clear that the Silverdome roof was "completely shredded and destroyed" before notice was given to Defendant. *See* Dkt. No. 1 at ¶ 30. Per the undisputed facts, Plaintiff took multiple actions between the time it learned of the alleged furnace malfunction and the time it intentionally deflated the roof. Plaintiff then waited until the roof was completely destroyed by gale force winds between January 3, 2013 and January 20, 2013, before providing notice of the alleged furnace malfunction to the Defendant on January 25, 2013. Given these facts, the Court finds that Plaintiff's actions and delay in providing notice materially prejudiced Defendant's investigation of the North Furnace and the Silverdome's roof.

---

and noting "[i]t is clearly for the interest of insurance companies that the extent of losses sustained by them should be speedily ascertained[.] . . . The conditions in policies requiring notice of the loss to be given, and proofs of the amount to be furnished the insurers within certain prescribed periods, *must be strictly complied with to enable the assured to recover*.") (emphasis added); *Wehner*, 331 Mich. at 121, 49 N.W.2d at 90-91 (citing *Parrish v. Phillips*, 229 Wis. 439, 282 N.W. 551, 553 (1938), as an example of a case where notice thirty-three days after an accident was deemed insufficient); *Parrish*, 229 Wis. 439, 282 N.W. at 553 ("The reasons for the policy provisions requiring the assured to give written notice of an accident as soon as practicable are obvious. . . . It is the experience of every defender of causes that *it is a matter of first importance to become possessed of all material facts . . . at the earliest possible moment, as facts may be forgotten or distorted* [.]") (emphasis added); *Downing v. Rockford Dist. Mut. Tornado Ins. Co.*, 112 Ill. App. 2d 340, 344-45, 250 N.E.2d 827, 829 (Ill. App. Ct. 1969) (examining a case where severe weather—a tornado—damaged a corn crib and Plaintiff waited twenty days to give notice to the insurer, at which time the corn crib had completely collapsed. The Court found that the "*delay of twenty days, and the fact that the notice was only given after a second and total loss*," was not notice in compliance with the policy, which required immediate written notice. More importantly, the court noted that "*prejudice obviously occurred*.") (emphases added).

It is undisputed, that Defendant had neither notice nor access to the furnace or roof prior to the roof's destruction. This lack of notice prejudiced Defendant because if this action was to proceed to trial, one way Defendant could avoid liability is by showing that the purported failure of the North Furnace on December 24, 2012 did not actually cause the hole in the Silverdome's roof on December 29, 2012. This showing could have been made if Defendant had access to analyze the North Furnace at the time the roof was still intact. In light of Plaintiff's actions, however, this could not occur.

Additionally, if this case proceeded to trial, Defendant could avoid liability by demonstrating the Silverdome's roof was, in fact, repairable before Plaintiff intentionally deflated it on January 2, 2013. Had Defendant's experts or consultants been given an opportunity to examine the hole in the roof before its deflation, this showing could have been made. Again, however, given Plaintiff's actions, such a showing is unavailable to support Defendant's position.

As Defendant explains, "plaintiff handed [Defendant] a total loss instead of the partial loss that existed on December 24, 2012 . . . the partial loss that still existed when the initial roof tear occurred on December 29th, or even the partial loss that remained as of January 2nd, before the roof was deflated." Dkt. No. 62 at 7. The Court finds that this delay prejudiced Defendant by depriving it of the opportunity to conduct an investigation of both the initial hole in the roof and the North Furnace.

Plaintiff attempts to justify its delay in giving notice by arguing that it "had a massive crisis on its hands caused by the mechanical breakdown of the North Furnace." Dkt. No. 53 at 24. Plaintiff also argues that the Defendant "wants to play Monday-morning quarterback" with respect to this unfortunate situation. *Id.* However, Defendant is not playing "Monday-morning

quarterback" by noting that it was *never* afforded an opportunity to perform the following tasks, including: repairing the furnace before the total destruction of the roof; analyzing whether the purported broken furnace affected the roof; analyzing if the roof, in fact, could have been repaired; or recommending measures to mitigate any potential loss from the alleged broken furnace.

Plaintiff argues that "once the roof was breached on December 29th, there was nothing anyone could do to save it given the extreme weather conditions." Dkt. No. 53 at 24. Plaintiff's position that the furnace could not have been repaired and the roof's destruction was a *fait accompli* is speculative. More importantly, it is not relevant because the Defendant need *not* prove that it could have fixed the damage to the roof. The Court reiterates that Defendant is only required to demonstrate that it was prejudiced by Plaintiff's late notice; *not* that the roof could have been re-inflated or repaired. *See West Bay Exploration Co.*, 915 F.2d at 1036 (citing *Steelcase,* 1990 WL 92636 at *4, to note that Michigan law does *not* require an insurer to prove that but for the delay it would have avoided liability) (emphasis added).

After reviewing the arguments and the undisputed facts, it is clear that "one conclusion only is reasonably possible[:]" Defendant was prejudiced as a matter of law. *See*, *e.g.*, *West Bay Exploration Co.*, 915 F.2d at 1037 ("By destroying the drip barrels in its clean-up effort, [the plaintiff] has materially compromised the defendants' ability to present their most powerful defense to liability under the policy."); *see also id.* ("[The Plaintiff] left the defendants 'without the option of suggesting, or even mandating, the use of less costly, more efficient procedure[s]' . . . [W]e feel that this is a case in which '"the lapse of time which removes the opportunity for prompt investigation, also destroys the possibility of showing prejudice arising from delayed inquiry."'") (citing *Wehner*, 313 Mich. at 120, 49 N.W.2d at 87); *First Mercury Ins. Co. v.*

-15-

*Christopher K Corp.*, No. 09-14918, 2011 WL 3497294, at *8-9 (E.D. Mich. Aug. 10, 2011) (finding that material prejudice was demonstrated because insurer was "deprived of the ability to investigate and contest the extent of its liability" and the insurer could not "contest the proportionate share" of its liability or "contest and investigate the extent of the liability[.]"). Accordingly, the Court finds that no reasonable jury could conclude that Plaintiff gave Defendant prompt notice following the purported mechanical breakdown of the North Furnace.

### 2. The Evidence Shows That The Purported Fortuitous Event Was Not Solely Attributable to the Mechanical Breakdown of the North Furnace.

Additionally, even if a reasonable jury could conclude that Plaintiff gave Defendant prompt notice, the Court would still find that Plaintiff cannot show that the roof's destruction was "solely attributable" to an accident involving the North Furnace. The first page of the Equipment Breakdown Coverage Form indicates that the Policy "provides insurance for a Covered Cause of Loss[.]" Dkt. No. 50 at 25 (Ex. A at HSB000025). According to the Policy, the "Covered Cause of Loss for this Equipment Breakdown Coverage is an 'accident.'" *Id.* The policy specifically states that coverage applies "only to the *direct result* of an 'accident,'" and Defendant "will pay only for that portion of the loss, damage or expense that is *solely attributable* to the 'accident.'" *Id.* (emphases added). The Policy further states that "[w]ithout an 'accident,' there is no Equipment Breakdown Coverage." *Id.*

The term "accident" is defined as "*a fortuitous event* that causes direct physical damage to 'covered equipment.'" *Id.* (emphasis added). The Policy explicitly notes that "covered equipment" does not include, amongst other things, "[s]tructure, including but not limited to the structural portions of buildings and towers, scaffolding, and any air supported enclosure." *Id.* at 39 (Ex. A. at HSB000039). The fortuitous event "must be one of the listed events, which include

-16-

circumstances such as a "mechanical breakdown" and "artificially generated electric current." *Id.* at 25 (Ex. A. at HSB000025).

Plaintiff argues that "the destruction of the roof was caused by the 'fortuitous event' of the breaking of 3 vanes of the combustion blower wheel of the North Furnace on or before December 24, 2012." Dkt. No. 53 at 26. Plaintiff further argues that this mechanical breakdown rendered the North Furnace inoperable, and that "the inability of the North Furnace to heat the roof in the area of the North Furnace directly led to ice tearing a hole in the roof **directly over the area of the inoperable North Furnace.**" *Id.* (emphasis in original).

The Parties dispute whether the hole was, in fact, located directly over the North Furnace. The Parties further dispute whether the North Furnace was even the cause of the hole. For purposes of this Summary Judgment Motion, the Court will assume that the hole was directly over the area of the North Furnace. The Court will also assume that the hole was caused by an inoperable North Furnace as Plaintiff asserts. As such, looking at the evidence in a light most favorable to the non-moving party, the Court finds, for purposes of this Motion, that there was a fortuitous accident as defined by the Policy covering the North Furnace.

Nonetheless, even assuming there was a fortuitous mechanical breakdown of the North Furnace, the Court emphasizes that Plaintiff must still demonstrate that the destruction of the roof was the "direct result" and "solely attributable" to the purported mechanical breakdown. The Plaintiff addresses this requirement as follows:

> In this case, the accidental mechanical breakdown of the North Furnace caused the ice to accumulate DIRECTLY OVER the North Furnace, and to ultimately tear a hole through the roof within *50 feet* of the North Furnace. Once the hole formed, the wind tore the roof and there was no repair which could have been performed to prevent the roof's deflation and ultimate destruction. Had the North Furnace not had an accidental mechanical breakdown, the hole in the roof would not have formed. The claim is actually that simple. Therefore, the destruction of the roof was the direct result of the initial accident. According to the plain

>language of the HSB Policy, all of the accidents flowing from the initial mechanical breakdown of the North Furnace are one accident under the Policy and coverage applies.

Dkt. No. 53 at 27 (emphasis in original).[2]

The claim is not actually as simple as Plaintiff asserts. Plaintiff's conclusion that "all of the accidents flowing from the initial mechanical breakdown of the North Furnace are one accident under the Policy" can neither be squared with the Policy's direct and solely attributable requirements, nor previous positions taken by Plaintiff.

Plaintiff relies on the Policy's definition of "One Accident" to reach its conclusion that that "all of the accidents flowing from the initial mechanical breakdown of the North Furnace are one accident under the Policy." The Policy defines "One Accident" as "all 'accidents' occurring at the same time from the same event. If an 'accident' causes other 'accidents,' all will be considered 'one accident.'" Dkt. No. 50 at 40 (Ex. A. at HSB000040).

The Defendant aptly notes that Plaintiff's interpretation of "One Accident" in this context is incorrect because "there is one and only one alleged covered 'accident' here, the one Plaintiff claims occurred to the north direct furnace on December 24, 2012. *This is not a case about multiple covered 'accidents.'*" Dkt. No. 62 at 9 n.3 (emphasis added). Plaintiff has not identified another covered accident under the policy that flowed from the purported mechanical breakdown of the North Furnace.

Plaintiff's argument would be more compelling if the destruction of the Silverdome's roof was an accident as defined in the Policy. However, this is simply not the case. Wind

---

[2] The Court finds it curious that, in less than one page, Plaintiff changes its position regarding the location of the hole that was purportedly caused by the inoperable North Furnace. Initially, the Plaintiff stated that the hole was directly over the North Furnace. A page later, however, Plaintiff stated that the hole was within fifty feet of the furnace. *Compare* Dkt. No. 26 at 26 ("[T]he North Furnace directly led to ice tearing a hole in the roof **directly over the area of the inoperable North Furnace.**") (emphasis in original), *with id.* at 27 ("the North Furnace caused the ice to accumulate DIRECTLY OVER the North Furnace, and to ultimately tear a hole through the roof **within 50 feet of the North Furnace**.") (bold emphasis added).

damaged roofs are not one of the events that are enumerated under the Policy. *See* Dkt. No. 25 at 50 (listing the events that can be deemed accidents). Plaintiff's misunderstanding of the Policy is detrimental to its case. Nothing illustrates this fact more than Plaintiff's failure to put forth an argument rebutting Defendant's contention that the North Furnace was not the direct and sole cause of the Silverdome roof's destruction. Plaintiff focuses on the "One Accident" provision of the Policy; yet Plaintiff fails to address the fact that the Policy indicates that Defendant will only pay for the portion of the loss that is the "direct result" of and "solely attributable to" the accident at the North Furnace.

Plaintiff has taken the position throughout this litigation that a winter storm was a cause of the Silverdome roof's destruction. *See*, *e.g.*, Dkt. No. 1 at ¶ 30 ("On or about January 20, 2013, the Pontiac area suffered a strong winter storm with winds measuring upwards of 60 mph . . . the storm completely shredded and destroyed the fabric of the roof[.]"); Dkt. No. 53 at 24 ("The roof was destroyed by gale force winds between January 3rd and January 20th."). Furthermore, Plaintiff has indicated that it intentionally deflated the roof. Dkt. No. 53 at 13 ("TIG therefore deflated the roof on January 2, 2013 for public safety concerns.").

Defendant argues that Plaintiff's deliberate deflation of the roof is just one of many examples demonstrating that the destruction of the roof was not the direct result of the North Furnace's purported mechanical breakdown. However, the Court need not delve into whether the Plaintiff's decision to deflate the roof was an intervening cause. The Court finds that the destruction of the Silverdome roof was not solely attributable to the purported mechanical malfunction of the North Furnace. Consequently, Defendant's coverage under the Policy does not apply.

## IV. CONCLUSION

For the reasons discussed herein, the Court will **GRANT** Defendant's Motion for Summary Judgment. The Complaint is **HEREBY DISMISSED** in its entirety, and judgment will be entered for the Defendant.

SO ORDERED.

Dated: December 16, 2014

      /s/ Gershwin A. Drain
Hon. Gershwin A. Drain
United States District Court Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 16, 2014.

s/Felicia M. Moses for Tanya Bankston
TANYA BANKSTON
Case Manager